IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                                                                                    PLAINTIFF

v.                                    CASE NO. 5:22-cr-50058-TLB-004
                                                  5:22-cr-50075-TLB-001

DANIEL LE                                                                                                        DEFENDANT

**DEFENDANT'S SENTENCING MEMORANDUM**

COMES NOW, the Defendant, DANIEL LE, by and through his attorney of record, Shane Wilkinson of the Wilkinson Law Firm, and for his Sentencing Memorandum states as follows:

**I.     SUMMARY**

At face value, Daniel Le comes before this Court as an anomaly. He has pleaded guilty to two very serious, independent crimes – Possessing with Intent to Distribute More than 5 Kilograms of Cocaine (Case 5:22-cr-50058 "the drug case") and Transportation of Child Pornography (Case 5:22-cr-50075 "the child pornography case"). As this Court is aware, upon Mr. Le's arrest for the cocaine offense, separate evidence of the child pornography offense was discovered on Mr. Le's cell phone as law enforcement sought further information about Mr. Le's codefendants in the drug case. Because both sentencing for both cases is being consolidated, Mr. Le will speak to both cases in this same sentencing memorandum.[1]

Mr. Le comes before the Court fully appreciative of the unique severity of his circumstance. It is not lost on Mr. Le that facing sentencing for either of these cases alone would be a sobering moment let alone facing both of these crimes together. However, this Court's task

---

[1] This sentencing memorandum is being filed in both of Mr. Le's cases (5:22-cr-50058-TLB-004 and 5:22-cr-50075-TLB-001).

is to look beyond the initial shock and curiosity of Mr. Le's two cases and delve deeper into the unquantifiable equities of Mr. Le's life to form just, individualized sentences as justice and fairness permit under the circumstances. Mr. Le contends that such a sentence will fall below the guidelines recommended sentencing range.

## II.     SENTENCING STANDARDS

It is well established that the sentencing ranges described in the sentencing guidelines are merely advisory. *United States v. Booker*, 543 U.S. 220, 245-46 (2005). The guidelines range is simply the "starting point" and the "initial benchmark" before engaging in certain statutory considerations. *See Gall v. United States*, 552 U.S. 38, 49 (2007) (finding a non-guideline sentence reasonable). The guidelines are designed to assist a judge in sentencing by reflecting a "rough approximation of sentences that *might* achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007) (emphasis added). However, sentences within in the guideline ranges are not entitled to a presumption of reasonableness; it is still the responsibility of the District Court Judge to make an "individualized assessment" of the appropriate sentence in light of the facts of each case. *Peugh v. United States*, 569 U.S. 530, 552 (2013). A judge's freedom to depart from the guidelines is not limited to mere instances of excessive sentences in an individual case, but a judge may even depart based on policy disagreements with the guidelines themselves. *Spears v. United States*, 555 U.S. 261, 264 (2009) (*per curiam*). Ultimately, "the district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." *Kimbrough*, 552 U.S. at 113 (Scalia, J., concurring).

Congress has directed courts to impose sentences that are "sufficient, but not greater than necessary": (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (2) to afford adequate deterrence to criminal conduct; (3)

to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

In achieving that goal, courts are also directed to consider several factors, amongst others, such as: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the recommended sentence pursuant to the Sentencing Guidelines; and (4) the need to avoid unwarranted sentence disparities. 18 U.S.C. § 3553(a).

### III.   ANALYSIS OF 18 U.S.C. § 3553(a) FACTORS

#### a.  The Nature and Circumstances of the Offense

Both crimes here are factually fairly simple. First, Daniel agreed to drive a shipment of cocaine from Texas to Northwest Arkansas for a sum of money that at the time seemed worth the risk. Of course, now Daniel has had to come to the realization that he has traded his liberty for an easy rent payment.

There is no contention that transporting over 10kg of cocaine is not a serious offense nor a serious public health concern. However, even amongst cocaine mules, there is a sliding scale of culpability. Not all trafficking is equally egregious. Here, Daniel Le did not attempt to flee from law enforcement when the traffic stop was initiated. Candidly, Daniel did not immediately confess to having cocaine on the side of the road, but once he was placed under arrest, Daniel at that point began taking immediate steps to cooperate with law enforcement. As outlined in the Pre-Sentence Investigation Report (Document 66), Daniel conducted a proffer interview with the Government. Daniel's proffer is an undervalued piece of this story. To be plain, Daniel Le cooperated to his best ability and shared what information he had. The problem for mitigation purposes, is that

Daniel Le really did not have much critical information to share because Daniel was truly just a courier playing a small part in a much larger scheme. To that end, it is important that this Court place due weight on Daniel's earnest effort to proffer his limited knowledge of his codefendants' activities even if Daniel had little information the Government was not already aware of.

In fact, Daniel's earnest effort to cooperate with the drug case is how the child pornography case came about. As the PSR notes, Daniel's cell phone was seized to search for communications between Daniel and his codefendants. Daniel supplied the Government with his passcode which ultimately aided the discovery of the child pornography material on Daniel's phone.

At this stage, faced with a serious drug trafficking offense and now the revelation that child pornography had been discovered on his cell phone, Daniel Le decided to continue to cooperate. Daniel waived indictment and pleaded guilty to an information for transporting child pornography. Moreover, at the aforementioned proffer interview, Daniel Le volunteered information about how he was accessing the child pornography. Daniel explained how he discovered the communities and distributors mentioned in Paragraphs 11-30 of the PSR (child pornography case Document 15).

Daniel's behavior is aggravating insofar as Daniel was engaging in direct peer to peer communication to obtain the child pornography. However, how Daniel got involved in viewing child pornography is relevant. Daniel began looking for legal adult pornography and specifically for free access to material that is often posted behind a paid access website. Daniel discovered communities on Telegram that would share the paid content for free amongst the users. At this point, Daniel's behavior was only wrong to the extent that he was violating copyright regulations. The problem arose when amongst these various sharing communities, Daniel also came across communities advertising child pornography. Curiosity and desensitization to traditional

pornography led Daniel down a chain of one link to another and ultimately before this Court.

As this Court is well aware, the "why" behind child pornography cases cannot be fully answered without the assistance of licensed mental health experts. To be candid with the Court, when discussing the child pornography charge with undersigned counsel, Daniel has been fully forthcoming and thoughtful about the circumstances, but he also recognizes that even he does not fully understand why he ever viewed or continued to view that material. To that end, Mr. Le would greatly appreciate that this Court's sentence include a recommendation to the Bureau of Prisons that Daniel be placed in a facility with relevant sex offender support programs to help him understand this behavior fully.

Lastly, it is important to distinguish the cold calculations of the guidelines from the nuanced pattern of behavior Daniel engaged in. While Daniel does not contest that he possessed images of children under the age of 12 such as those described in paragraphs 12a-12d of the PSR (document 15), the actual messages between Daniel and the other users show that Daniel was not interested in any of those images nor intentionally seeking those images out:

- ["Le] wanted to confirm that they contained ages 12 through 17 which the user confirmed. After the purchase, Le stated the girls were too young and that they were mostly toddlers, and they stopped doing business after this point." *PSR at ¶ 19.*

- "Le stated he 'did not like them too young.' Le further stated he preferred the 13 to 17 age range." *PSR at ¶ 25.*

- "Jojo advised he only had 'cp,' and they agreed to make a trade. Le later said, 'That's too young,' and Jojo replied saying that he (Jojo) preferred 'porn teen 14-yrs,' and Le also agreed." *PSR at ¶ 28.*

A counterargument could say that a freshly rotten apple is just as spoiled as a month-old rotten apple, but the equities of 18 U.S.C. § 3552 demand that the sentencing court take note of these distinctions.

Ultimately, it is the combination of these two crimes that presents a more aggravating

image than do the specific circumstances of either case independently. Nonetheless, a fair consideration of Mr. Le as a person and human being helps temper the collaborative shock of these two crimes.

### b. The history and characteristics of the defendant

On paper, it seems inconceivable that Daniel Le committed these crimes. Nothing in his past as a military aircraft mechanic or a loyal friend prepared his friends and family for this dramatic development. The truth is that Daniel took a subtle path to this point, but the path is clear. Daniel Le sought purpose, community, and gratification without foresight to consider the gravity of where and how he sought that fulfillment.

Daniel Le grew up a poor second generation Vietnamese-American around Garland, Texas. Daniel's parents took jobs and housing where they could find them, and it was unfortunately common that Daniel and his siblings did not stay in any one location for more than a year growing up. Compounding the situation was the fact that Daniel and his siblings were not primary English speakers growing up. Daniel's cousin Tasha Lewis described in her letter of support how Daniel and the others had to grow up on their own with little guidance from their parents on how to make it in what was still a de facto foreign land.

Daniel has always lived in his older brother Johnny's shadow. The two grew up as best friends, but the fact remained that Daniel saw the world as "Johnny's little brother" first and as his own person second. As the support letters attest, Daniel grew up a kind and honorable person, but he was still lacking any real purpose in life, so he joined the military as many young men looking for structure and purpose do. Daniel joined the Marine Corp Reserves with the goal of acquiring purpose and a good job close to home when he got out. The aircraft mechanic track fit those metrics, so Daniel let the military shape him into a mechanic. The only problem was that Daniel

6

never had any passion for that job.  Rather, Daniel sincerely hated that work. He came out of the military at the end of his 5-year contract still just as aimless as he was fresh out of high school.

Johnny and Tasha's letters in particular recognize that Daniel was still searching when he got out of the military.  As the PSR notes, Daniel shifted from job to job over the next few years looking for what he is supposed to do and who he is supposed to be as an adult.  *See PSR (Document 15) at* ¶ 80-84.  It is at this time, several extreme stresses all converged on Daniel and put him on the path leading to these cases.

First, Daniel felt self-resentment for being twenty-seven (27) years old and still living at his mom's house while his siblings had gone off on their own.  In particular, Daniel's older brother Johnny was a successful, independent adult, and he made it look easy to Daniel the whole time.  One day, Daniel's serious girlfriend broke up with him leaving Daniel spiraling.  As these stresses converge, Daniel goes to a weekend music festival where he first met his current girlfriend and his codefendants in the drug case.  Over the next few days, when Daniel was at his lowest and in hindsight almost certainly experiencing a mental health crisis, Daniel experiences a heavy dose of drugs and partying and instant newfound friendship.  In a matter of hours, Daniel went from an all-time low to a state of euphoria and love and belonging.  For Daniel who always grew up as a transient outsider who had to share his older brother's friend groups, who came out of five years in the military without the brotherhood and purpose he was promised, he had finally found something he cared about – these new friends.

As Daniel continued to dive further and further into partying and drug addiction, Daniel became more involved in drugs as a way to fund his own personal habit as well as provide the easy instant success he could show off to make his family proud of him.  Daniel found a way to finally keep up with his older brother and provide for himself.  The money was easy and good.  During

7

this time of extreme excess in Daniel's life is also the time when he started clicking on the illicit child pornography links. Daniel did not just cross the road without looking. He did not just jump off a cliff. Daniel fully acknowledges he strapped himself to a rocket without any foresight.

Unfortunately, Daniel knows he is relegated to contemplation with hindsight now. Fortunately, Daniel has been using his time in pre-sentencing incarceration to reflect on his behavior. Daniel has expressed remorse to his family for his behavior and to the Court in his allocution letter. Daniel has caused pain, and he appreciates that now. Daniel's capability for self-reflection and internal criticism is consistent with the honorable, charitable person described in Daniel's support letters. The good, sincere Daniel Le is still here even if he was lost for a time. Many criminal defendants express remorse for getting caught. Daniel Le is one of those who expresses his remorse for the people he now sees he hurt in his search for excess and instant gratification.

    c. **The recommended sentence**

According to the PSR calculations, the sentencing guidelines recommend a sentence of imprisonment of **41-51 months** for the drug case and **210-262 months** for the child pornography case. This Court is guided to craft a sentence that is "not greater than necessary" to achieve the goals of 18 U.S.C. § 3553.

With regard to the child pornography case, the Sentencing Guidelines are not based on any empirical research and do not provide any meaningful guidance to distinguish offender culpability. Many of the specific offense characteristic enhancements found in USSG § 2G2.2 apply in nearly every child pornography case by default. As such, the suggested guideline range should be rejected by this Court.

The base offense level for Daniel's behavior of transportation of child pornography is 22. However, Daniel's behavior is further subject to essentially a default enhancement of 13 more points for committing the offense in a routine manner.[2] Numerous district courts within the Eighth Circuit have echoed this criticism of the unreasonableness of the guidelines for child pornography cases.

> Congress has created a fifteen-year window, between the statutory minimum (5 years) and maximum (20 years) sentences, within which this Court can penalize a convicted child pornographer. However, on account of Congress' tinkering with the guidelines, the Commission now recommends that nearly all defendants be incarcerated near the twenty-year statutory maximum.

*United States v. Johnson*, 588 F. Supp. 2d 997, 1004, 2008 U.S. Dist. LEXIS 106494, *16-18 (S.D. Iowa December 3, 2008).

> The Guidelines sentencing scheme for child pornography crimes illogically skews sentences for "average" defendants to the upper end of the statutory range, regardless of the particular defendant's acceptance of responsibility, criminal history, specific conduct, or degree of culpability, thus blurring distinctions between the least culpable and the worst offenders.

*United States v. Howard*, 2010 U.S. Dist. LEXIS 17740, *32, 2010 WL 749782 (D. Neb. March 1, 2010)

> Unlike sentencing enhancements for many other crimes, the Commission did not determine that child pornography defendants who are subject to typical child pornography enhancements, such as use of a computer, are more culpable, more dangerous, or in need of a longer prison sentence as a deterrent than those defendants who commit the same offense without those same enhancements. Therefore, the Guidelines range in the typical child pornography case fails to achieve the § 3553(a) objectives.

> The lack of empiricism underlying the Guidelines for possession of child pornography crimes is reflected in the sheer unhelpfulness of the sentencing ranges for such crimes, which routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases.

---

[2] Daniel receives 2 points for material involving a minor less than 12, 4 points for sadistic material or material involving an infant or toddler, 2 points for using a computer, and 5 points for having more than 600 images.

*United States v. Munoz,* No. 11-167 (JRT/AJB), 2012 U.S. Dist. LEXIS 155050, at *11-13 (D. Minn. Oct. 30, 2012).

Most of the specific offense characteristics attributed to Daniel's behavior apply to the overwhelming majority of child pornography cases. They provide no meaningful insight into whether Daniel's behavior is more or less culpable than the average offender. In fiscal year 2021, the 2-point enhancement for a minor under the age of 12 applied in 94.5% of cases. U.S. Sentencing Commission, *Use of Gudelines and Specific Offense Characteristics*: Guideline Calculation Based (Fiscal Year 2021) at 98. The enhancements for distribution under USSG § 2G2.2(b)(3) applied in 52.4% of cases, and the specific 5-point enhancement applied to Daniel's distribution behavior applied in 10.9% of cases.[3] *Id.* The 4-point enhancement for sadistic, masochistic, or violent material or material involving infants or toddlers applied in 81.8% of cases. *Id.* The 2-point enhancement for use of a computer applied in 96.1% of cases. *Id.* at 99. Lastly, the severe 5-point enhancement for possession of 600 images or more applied in 73.2% of cases. *Id.* Daniel Le is no more than an average offender when statistically compared to his peers, yet the illogical structure of the guidelines still places him at the higher range of the available sentence and even beyond the statutory maximum.

The United States Sentencing Commission has already recognized that the current guidelines are long overdue for reform. The guidelines are simply anachronistic and do not reflect the current digital world we live in. For example, the enhancement for the number of images was created when individuals often acquired their child pornography in the mail, meaning it took considerably more effort to amass large collections compared to today's offenders who routinely

---

[3] This 5 point enhancement under USSG §2G2.2(b)(3)(B) is the only statistically unique specific offense enhancement for Daniel's behavior. However, as stated above, this enhancement is not based on any empirical finding that such behavior is linked to an increased risk of danger for future or escalated reoffending.

10

receive large volumes of child pornography at once via file sharing like Daniel did. *See* FEDERAL CHILD PORNOGRAPHY OFFENSES at 312-13. "As a result, enhancements that were intended to apply to only certain offenders who committed aggravated child pornography offenses are now being applied routinely to most offenders." *Id.*

> [F]our of the of six sentencing enhancements in §2G2.2 — those relating to computer usage and the type and volume of images possessed by offenders, which together account for 13 offense levels — now apply to most offenders and, thus, fail to differentiate among offenders in terms of their culpability. These enhancements originally were promulgated in an earlier technological era, when such factors better served to distinguish among offenders.15 Indeed, most of the enhancements in §2G2.2, in their current or antecedent versions, were promulgated when the typical offender obtained child pornography in printed form in the mail.

*Id.* at iii.

The fact that Daniel Le's behavior receives the same 13-point enhancement as every other typical offender shows just how counterproductive use of the guidelines truly is. There is no meaningful distinction between offender culpability. The sentencing range is between 5 and 20 years imprisonment. That means there must be a manner to transport child pornography that only warrants 5 years imprisonment, and there must be a much worse manner to receive child pornography that warrants 20 years imprisonment. The guidelines offer this Court no credible guidance as to where Daniel Le falls in that range. Thus, this Court should disregard the guidelines suggested range.

## IV. CONCLUSION

Accordingly, for all of the preceding arguments, MR. LE respectfully requests that this Court grant a below guidelines sentence as justice and fairness permit under the relevant circumstances.

Respectfully submitted,

By /s/ Shane Wilkinson
Shane Wilkinson, Bar #2002160
WILKINSON LAW FIRM
700 S. Walton Blvd., Suite 2
Bentonville, AR 72712
(479) 273-2212 Phone
(479) 273-5655 Fax

**CERTIFICATE OF SERVICE**

    I, Shane Wilkinson, hereby certify that on July 12, 2023, I electronically served foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing and that a copy of the foregoing was also sent via email to the following:

Brandon Carter
Assistant U.S. Attorney
Western District of Arkansas

/s/ Shane Wilkinson
Shane Wilkinson